# IN THE COURT OF APPEALS OF IOWA

No. 17-1177
Filed October 11, 2017

**IN THE INTEREST OF A.G., R.G., and K.H.,**
**Minor Children,**

**C.B., Father,**
        Appellant,

**T.G.-H., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Webster County, Angela L. Doyle,

District Associate Judge.


        The mother and one of the fathers appeal from the termination of their

parental rights.  **AFFIRMED ON BOTH APPEALS.**


        Douglas E. Cook of Cook Law Office, Jewell, for appellant father of A.G.

        Neven J. Conrad of Baker, Johnsen, Sandblom & Lemmenes, Humboldt,

for appellant mother.

        Thomas J. Miller, Attorney General, and Ana Dixit, Assistant Attorney

General, for appellee State.

        Derek J. Johnson of Johnson & Bonzer, P.L.C., Fort Dodge, guardian ad

litem for minor children.


        Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**POTTERFIELD, Judge.**

The mother appeals the termination of her parental rights to her three children, A.G., born in 2011;[1] R.G., born in 2014; and K.H., born in 2015.[2] The mother claims the State failed to establish the statutory grounds for termination. Alternatively, she maintains the children could be returned to her care if she was given an additional six months to work toward reunification. The mother also argues termination of her parental rights is not in the children's best interests.

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) became involved with this family in August 2014, when R.G. was born with THC in his system. Neither

---

[1] The parental rights of A.G.'s father were also terminated, and he appeals. As he did at the juvenile court, the father concedes he is unable to be the custodial parent of A.G. He also admits he has "no significant dispute with the court's finding of fact," which included findings that the father's "visits are sporadic" and he had no "contact with [A.G.] from September of 2016 through late February 2017. The DHS worker has continually attempted to contact [the father] to offer visits and transportation through the [family safety, risk, and permanency] (FSRP) provider. [The father] has not taken advantage of these services."

Rather, the father uses his appeal as an attempt to bolster the arguments of the mother so that he may remain in A.G.'s life as a noncustodial parent. The father is not allowed to make arguments on behalf of the mother. *See, e.g., In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007) (finding the court's denial of the father's motion to vacate was not an abuse of discretion because "[t]he father's only basis for the motion dealt with the change in the *mother's* living situation and how that should have prevented the termination of her parental rights. He did not have standing to assert that argument on her behalf in an effort to ultimately gain a benefit to himself, that is, the reversal of the termination of *his* parental rights"); *In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005) (stating that one parent cannot assert facts or legal positions pertaining to the other parent as the court makes a separate adjudication as to each parent). And insofar as we understand his best-interests argument to pertain to himself, we find the termination of his parental rights is in A.G.'s best interests. As noted, the father concedes he is not able to be the custodial parent of A.G. A.G.'s best interests require more than sporadic visits with a biological parent; she needs and deserves permanency. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and her "need for a permanent home"). Without further discussion, we affirm the termination of the parental rights of A.G.'s father.

[2] The parental rights of the legal and putative fathers of R.G. and K.H. were also terminated. None appeal.

A.G., who was two years old at the time, nor R.G. was immediately removed from the mother's care. Instead, the mother agreed to and began receiving daily in-home "safety services." The mother also agreed to complete drug treatment, receive a mental-health evaluation, maintain a home with appropriate cleanliness, and continue to meet with DHS.

By late October, DHS received reports the mother had failed to attend twelve of her outpatient treatments and was refusing to attend support meetings or parenting classes. The mother also refused to be supervised during a drug test, so she was allowed to proceed unsupervised. However, the temperature of the urine was not within normal range, and the test was considered invalid. Providers in the home noted it was cluttered, with food and clothing all over the floor.

In early November, the mother told the social worker she wanted to be done with services and did not want any providers to come back. She was discharged from drug treatment for lack of progress and lack of attendance. The mother refused to speak to the social worker about these developments, and she barred the FSRP worker from entering the home.

A.G. and R.G. were removed from the mother's care on November 11, 2014.

The children remained out of the mother's care until April 8, 2016— approximately seventeen months. In the meantime, K.H. was born in the summer of 2015 and remained in the mother's care. During the same period, at a permanency review hearing in October 2015, the court ordered an additional six months to work toward reunification. The court noted the mother had

completed a substance-abuse program and was consistently testing negative for illegal substances. Additionally, the mother had resumed taking her medications for her mental health after her pregnancy ended, was attending her monthly therapy appointments, and she and her new husband had moved into a new home, providing a fresh start away from recognized negative influences and without the clutter and garbage that was an issue in the previous home.

A.G. and R.G. returned to the mother's home for a trial visit on April 8, 2016, and the children were officially returned to the mother's care pursuant to a court order on April 28, 2016. At the time of their return, the court noted that the mother and her new husband had recently had some marital discord with the mother leaving the home and staying with a friend for a few days. The mother and husband were given referrals to a marriage counselor. Also, the condition of the new home had begun to be a concern.

Approximately four months later, in August 2016, all three children were removed from the mother's care and placed together with a foster family. The removal occurred after the mother and the maternal grandmother engaged in a physical altercation in front of A.G. Although it is unclear exactly how it occurred, as a result of the altercation, the maternal grandmother's arm was broken; a founded child abuse assessment resulted. Additionally, the mother appeared to be overwhelmed with caring for the three children full-time. The condition of the home quickly became "unsanitary and filthy," and the family's hygiene was poor. The mother quit taking her mental-health medication, and the mother's therapist expressed concern about the welfare of the children.

Between August 2016, when the children were removed for the final time, and June 2017, when the termination hearing was held, the mother continued to regress. Pictures admitted into evidence at the termination hearing show the unsanitary conditions of the family home, with multiple piles of animal feces being left on the floor and dirty, crusted pans and plates kept on the floor of the kitchen.[3] After the children were removed, the mother put wood chips in one of the bedrooms and kept a chicken and a rabbit in the room. The social worker testified there was animal urine on the furniture and a full litterbox that did not appear to get emptied kept on the dining room floor. Starting in March 2017, visits were no longer allowed in the home due to its condition. Rather than recognizing the condition of the home, the day before the termination hearing, the mother told the caseworker she would like to add more pets. Based on behavioral indicators, DHS believed the mother began using drugs again in January 2017, and the mother missed all twenty-three of the drug tests that were authorized after that date. The mother had stopped taking her mental-health medication and she refused to go to couple's counseling, even after she was arrested in April 2017 for perpetrating domestic violence against the husband. Although there was a no-contact order between the two for a short while, they had it dismissed and, at the time of the termination hearing, both the mother and the husband were again living in the marital home.

---

[3] The social worker had taken photos on March 8 and June 5, 2017, and the home was in similar unsafe conditions on each date with animal feces and large amounts of garbage present on both dates.

The mother did not testify at the termination hearing, but there was testimony she wanted to move homes again and that she believed she could be successful after another fresh start.

The juvenile court terminated the mother's parental rights to all children pursuant to Iowa Code section 232.116(1)(*l*) (2017). Additionally, the mother's parental rights to R.G. and K.H. were terminated pursuant to subsection (h) and to A.G. pursuant to subsection (f).

The mother appeals.

## II. Standard of Review.

We review termination proceedings de novo. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000).

## III. Discussion.

### A. Statutory Grounds.

As here, where the juvenile court terminated on more than one ground, "we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). Iowa Code section 232.116(1)(f) and (h) contain similar elements, and the mother does not dispute there is sufficient evidence to establish the first three elements of paragraphs (f) and (h). She does contest the fourth element, common to both paragraphs: that the children could not be returned her custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4), (h)(4); *see also D.W.*, 791 N.W.2d at 707 (stating the language "at the present time," as found in subsections (f)(4) and (h)(4), means "cannot be returned to the parents' care at the time of the termination hearing").

The mother maintains the children could be returned to her care at the time of the termination hearing because she intended to move to a new home, "which would provide a fresh start for not only her, but her children as well." This argument ignores the other facts in the record. First, the mother had already moved to a new residence during the pendency of the proceedings in order to obtain a fresh start. Still, shortly after, the home was in a condition that was unsafe for the children to live in. The mother had stopped taking her medication for her mental health, and it was believed she was again using illegal substances. The mother had been in one altercation that resulted in the maternal grandmother's arm being broken and a second altercation with the husband that resulted in the mother's arrest. She refused to attend couple's counseling with her husband. Additionally, the caseworker testified that when the mother was responsible for taking care of all three children, she became overwhelmed after a short time—a matter of hours. Nothing in the record— including the mother's intention to move again in the near future—supports a finding the children could be returned at the time of the termination hearing.

Alternatively, the mother claims the children could be returned in six months if she was given additional time to work toward reunification. *See* Iowa Code § 232.104(2)(b). Although the mother was once able to establish that she could meet DHS expectations in order to have the children returned to her, since the children were removed a second time, the mother has continued to regress. At the time of the termination hearing, even supervised visits could not take place at the home due to the dirty and unsafe conditions. The mother's statement to the social worker the day before the termination hearing that she would like to

add more pets to the home showed either a lack of understanding or an unwillingness to comply with the DHS requirements regarding the cleanliness of the home. Additionally, if the mother intended to take the current pets with her (and add more) to the new home, we see no reason to believe the circumstances of the present home would not continue to exist. The mother did not make any progress in the time period leading up to termination; there is no reason to believe an additional six months would cure the conditions that led to removal.

### B. Best Interests.

The mother also maintains the termination of her parental rights was not in the children's best interests. She notes the social worker agreed she shares a bond with the children and claims she has the ability to regain custody and keep them all together. At the time of the termination hearing, the oldest two children had been out of the mother's care approximately twenty-seven of the preceding thirty-two months. K.H., who was not yet two years old, had been out of the mother's care for approximately ten months. After two and a half years of involvement with DHS, the mother was not in a position to care for her children full-time, and, as noted above, there is nothing to suggest she could be in such place in the near future. In contrast, the three children were living together with one foster family, who wished to adopt all three siblings. The caseworker testified the children were "good" and "continuing to make progress." Additionally, "[t]hey're bonded with their foster mother" and "ha[ve] a good relationship with her." At this point, we cannot ask these children to continue to wait for a biological parent who may never be in a place to care for them. *See C.B.,* 611 N.W.2d at 495 ("Once the limitation period lapses, termination

proceedings must be viewed with a sense of urgency."); *see also D.W.*, 791 N.W.2d at 707 ("We do not 'gamble with the children's future' by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (citation omitted)).[4]

**IV. Conclusion.**

Because the statutory grounds have been met, the record does not support the mother's assertion the children could be returned in additional six months, and termination is in the children's best interests, we affirm.

**AFFIRMED ON BOTH APPEALS.**

---

[4] As part of her best-interests argument, the mother makes an argument on behalf of her husband, the legal father of K.H. The mother states, "[I]n the event the Court were to find an issue regarding Mr. Hall's lack of notice or involvement in the underlying CINA or similar absences in the Termination case, the Mother would ask the Court to consider the best interests of the family unit if [the husband] is given additional time due to procedural defects." The legal father did not appeal from the termination of his parental rights, and the mother has no standing to advocate on his behalf. *See D.G.*, 704 N.W.2d at 460. We do not consider whether there was defect in the legal father's participation or notice in the underlying proceeding.